Case number 12-2217, Huron Mountain Club v. US Army Corps of Engineers at all. We're learning about two C-15s of the size of the C-15 that are being shared by the athletes. Mr. Madison will be helping us. Before we begin, let me ask Ms. Smith and Mr. Ettinger, do you intend to split the time? I will be dividing my argument up with a five-minute rebuttal, please. May it please the Court, Rick Addison of the Munchhart Firm in Dallas, Texas, on behalf of the plaintiff appellant, Huron Mountain Club, appealing from Judge Bell's decision in the Western District of Michigan to deny the preliminary injunction we were seeking in connection with the Corps' action. The case is brought under federal question jurisdiction of the Administrative Procedures Act. We're complaining of the Corps' failure to act, and that's included in the definitional section at 551.13. The case really opens with the issue of whether or not the Corps has a mandatory duty under both the Clean Water Act and the Rivers and Harbors Act to require parties to submit to the regulatory process. And that mandatory duty with respect to the Rivers and Harbors Act is found in the plain, unambiguous language of Section 10. That section is divided into three clauses, and each one deals with obstructions to the navigable capacity of navigable rivers under the Rivers and Harbors Act. Each one of those clauses uses the term any. Any obstruction, any of the waters prohibited, first clause. Second clause, unlawful to build or commence the building of any other structures in any navigable water. Third clause, shall not be lawful to excavate, fill, or in any other way change the course of any navigable water. Under 7th grade geometry, we all know any means every. Every means all. That language of the statute establishes a mandatory duty that the Corps has to address any structure, any activity, whether it's in the navigable water or not, that may affect its navigable capacity. How do they do that? They do that by, when they find, there's two ways. Number one, when they find out there's a project that may do that, may have that effect, they then have to contact that group and say, are you getting a permit? There's a permitting process under the Rivers and Harbors Act and the Clean Water Act administered by the Department of the Army that approves or rejects any activity that may affect a navigable water. The part of the statute that you didn't focus on relates to the last clause, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army, and you overlooked the implementing regulations which say that the means by which that approval is sought is for the party who is excavating or altering or filling or modifying or whatever to seek a permit. Yes, Your Honor. The text of the statute and regulations doesn't contain a mandatory duty on the part of the Corps to ferret out individuals who might be seeking to undertake activity that requires a permit and talk to them first. I mean, the burden is on the person who needs to seek the permit, correct? I would agree with that. Once known to the Corps, the Corps then has the duty to determine whether that project affects the navigable water. And what we find from the Corps... Known to the Corps how? Well, in this instance, it became known to the Corps, according to the affidavit of the U.S. Army Corps, Mr. Connick, in 2005. They sat down and had a meeting with EPA in his declaration, I apologize, where they discussed this project. And they determined, and the affidavit tells us this, that there wasn't jurisdiction. That was their conclusion. In Mr. Connick's affidavit at paragraph 16, he concludes, it remains the position of the Corps of Engineers that the Salmon Trout River adjacent to this, 21 miles, does not fall within the Corps' jurisdiction. That sounds like you're complaining not of the failure to undertake mandatory action, but the correctness of the determination. Well, we're complaining about both of those. You're exactly right, Your Honor. The mandatory duty can't be to decide the case the way that you want it decided. No, the mandatory duty is that once it's known, the applicant, the potential applicant, Rio Tinto here, has to submit to the permitting process. And if they don't. Even if they've been told by the Corps that they're not required to. Well, that's the error we're talking about, Your Honor. What you're complaining about is the Corps' error, you claim error in saying no permit was required. That's exactly right. And in that context, they claim they had no duty to do anything. And we're saying they did. Now, let me address that briefly with respect to the mandatory duty. There are several cases also that address it. The Rio Grande case 114 years ago said that any obstruction to navigable capacity, anything wherever done or however done within the U.S. is part of the prohibition. In the Republic Steel case, Justice Douglas said, we can only conclude Congress' plan to ban any type of obstruction. So both of those we would suggest to the court shows that it was a mandatory duty and it's non-discretionary and it's complete. At what point were you aware of the Corps' conclusion that it lacked jurisdiction? When we got this affidavit from Mr. Connick is when we found out about it. We had no knowledge of the 2005 meeting. And I don't know who else would have because it went nowhere from there. And so we would suggest also, Your Honor, the Corps' own regulations establish the duty. And while it's cited in our brief, I'll briefly mention 33 CFR 322.3C2, Congress has delegated to the Secretary of the Army the duty to authorize or prohibit certain work or structures in navigable waters of the U.S. That's their own regulation. There are several similar to that. And, of course, in the case of Kirkland Masonry, the proposition is stated that any agency is required to follow its own regulations. And its own regulations contemplate that duty. They express that duty. And even if it wasn't a mandatory duty, it's a duty they took up in making a jurisdictional determination that the Salmon Trout River didn't fall within the Rivers and Harbors Act. All right. You want to take the position that you're not asking them to start an enforcement, right? Right. But what do they do when someone proceeds without a permit? Thank you, Your Honor. They go to them, if they know about it, and they say, you need a permit. That's not enforcement. That's not penalizing that. That is submitting them to the regulatory process. And that's how it works. What if they don't believe they need a permit? Well, that just depends on their discussions with the Corps. In my history, if the Corps tells you you need a permit, then you go get a permit. What if the Corps doesn't think they need a permit? Well, then that's fine. But if they're wrong in that jurisdictional determination that no permit is needed, that's actionable. And that's, in part, what we're suing about here. And I might add, that language – Under what? Well, first, under the Administrative Procedures Act, because it's the Corps' failure to act when they should have. If they had made a correct jurisdictional determination, they would be requiring Rio Tinto to get these permits now. Okay. And the basis for jurisdiction is what? Is the APA, Section 702, which allows an aggrieved person – No, no. The basis for their jurisdiction. The underlying jurisdiction is the Rivers and Harbors Act, Section 10, dealing with structures affecting navigable waters. But the judge decided it wasn't navigable. Right. And that's another point that I would like to address momentarily. It's also under the Clean Water Act, I might add. Not just Rivers and Harbors, but Clean Water Act. Now, as to the judge's decision, he made a couple of conclusions, and I'll be brief in mentioning them. But he said, first, we gave him some evidence, showed there was recreational activity on the Salmon Trout River, which under the regs can be considered for navigation and logging historically. That's all found in 33 CFR 329, those sections. And under that, he concluded that, number one, you didn't tell me where the recreational activity is occurring. But that's clear in the affidavit of Dr. O'Boyle. There it's undisputed that that activity begins approximately one mile from the mine and continues 8.7 miles. Complicated, but all of the experts in this case agreed that the excavation associated with the mine under the river would draw the water down from the wetlands through the groundwater into the mine. And my time is up for this moment, and I'll... Well, I just... You want me to finish that concept? Yes. Thank you. That's fine, but did you want to ask him something else? Well, I want to... You're saying... Okay, and the logging, what about that? Yes. Well, the way it works, and I might add, when you look at the conic affidavit, which is the only evidence the government put in, and he addresses all of that, he concludes the river was navigable two miles upstream from Lake Superior. And when you look at paragraph 12 of his declaration, you see that he did that based on the wrong criteria. He did it by saying this is where what's called the ordinary high-water mark of Lake Superior ends. We're not talking about the ordinary high-water mark of Lake Superior. We're talking about the ordinary high-water mark of the Salmon Trout River. I looked at all the evidence in the record that was cited with respect to this point about logging, and I agree that there's evidence that logging has occurred more than 100 years ago, and the logs have been transported on the Salmon Trout River. I can't figure out. I didn't see anything that pinpointed the location on the river where it occurred. I'd be happy to direct the Court to several points in that respect, Your Honor. First off, testimony by Rio Tinto's own expert, and I'll get the exact site when I get back up, said that there was evidence of logging on the mine. I looked at everything you cited in your brief. And then you know it happened on the mine site, logging. Logging may have happened on the mine site, but we're interested in what part of the river was used. Well, it would have to be from that point to the location of the mill, which is at Lake Superior. And the only way in those days to get down to that point was by river. Well, I'm suggesting you might know more about this topography than we do, but I'm not sure that the— I'm not sure we can conclude that based on what's in the record. Well, and I appreciate that, and then I'll stop. One other point in that connection. These waters, these wetlands that are being drawn down, are what are called the source or headwaters of this river. And there is no way, no way you can draw down the source and not affect the whole river. The judge found, because they were using some water they were dumping back in the river, that that had some sort of water balance. That's not right. Under Section 10, that's a separate violation. Each time you're changing the capacity of a river, you have to have a permit if you affect the navigable area. We demonstrated there was recreational activity starting at one mile from the site. The experts in the case, one of their experts, Mr. Workman, said the water from the source, the headwaters, goes all the way to Lake Superior. Well, when you don't have that water any longer, you can never replace it. You can put some more water in, but if you hadn't taken that source water out, that water would still be in the river. And so there is an effect on the navigable capacity. It goes all the way to Lake Superior. Now, and I apologize, I moved past my— I just have one other question. Yes, Your Honor. Why didn't you bring an action under the Clean Water Act? Pardon me? The Clean Water Act allows for a private cause of action, right? Why didn't you bring one? The Rivers and Harbors Act does not allow for a private cause of action. And so the only way to implement it is to bring it under the APA. And in the same manner, we said the Corps had a duty under the Clean Water Act established by the Avoyer and Hansen cases. And so both of those were brought under the APA. Also, there's no 60-day notice letter requirement, so you can bring the suit more quickly if you come under the APA. Well, you're a little belated anyway, given the history of this matter. But in the course of this, it did get delayed by other reasons. No, I'm sorry. When you first got up, did you say you were appealing from the denial of a— Preliminary injunction. Preliminary, okay. Yes, Your Honor. That's what I thought, but I thought you said permanent. Yes. Okay, thank you. All right, Ms. Smith. Good morning. May it please the Court. I am Maggie Smith on behalf of the Federal Defendants. I'll be reserving five minutes of my time for the co-defendants. All actions brought under the Administrative Procedures Act require identification of a discrete action, either a final agency action or an action unlawfully withheld. Huron Mountain Club has not identified such a discrete action in this case, and as a result, it is unlikely to succeed on the merits of its claims because it has not stated a claim under the APA. First, turning to Section 706.1, which provides a cause of action to challenge agency action unlawfully withheld, here the Corps has not failed to complete a mandatory duty, which is a discrete action legally required. The Club is claiming that the Corps has violated the Clean Water Act and the Rivers and Harbors Act by failing to require Kennecott to submit to permitting procedures, but nothing in the statutes or regulations creates such an obligation on behalf of the Corps. Indeed, neither has even a mechanism by which the Corps could compel a private party to submit a permit application if that party chose not to do so. Well, you have an enforcement action. Right, and the Corps could bring an enforcement action against a private party that's in violation of either the Clean Water Act or the Rivers and Harbors Act, but that would subject the defendant in that case to penalties. It wouldn't be an action to make them file a permit application. I'd like to make an analogy. There are a lot of things in immigration cases that are unreviewable, okay? In a lot of cases, but the determination that there's no jurisdiction, that is, when the court decides, I don't have the authority to do this, in all of those circumstances, we then will review it. So we won't review the decision, but we will review the determination that there's no jurisdiction or authority to do it. So why isn't it the same thing here? If the basis for their decision is not that they're exercising their discretion, we don't want to force this, that, the other thing, but that this is not within our jurisdiction, why should we not review that determination? Well, Your Honor, assuming that those are APA cases, presumably in those cases the plaintiff has identified a final agency action that it believes is a jurisdictional determination that is reviewable by the court on the basis of arbitrary and capricious review. That hasn't happened here. The plaintiffs have never identified what they believe a final agency action. That allegation is absent from its complaint. It's absent from the briefing. But there was a final agency action. You decided there was no jurisdiction. You weren't going to do anything. No, Your Honor. Here there is no final agency action, and leaving aside the point, which I think is an important one, that they were required to raise that in their complaint if that was the argument they were making. Leaving that aside, there is no final agency action here. The court has simply not done anything. It just simply hasn't brought an enforcement action. Let's assume that there was some sort of a formalized or semi-formalized determination that there was no jurisdiction. What would be the duty on someone aggrieved by that, as presumably the Huron Mountain Club claims it is? I mean, even though I understand they haven't made that argument, what would be their duty with respect to the time limits for challenging it, and what would be their diligence duty to ascertain that the ruling had been made, if it had been made in a less formal manner than your typical public sorts of proceedings? I mean, certainly latches in the statute of limitation would apply to any sort of challenge to a final agency action on a negative jurisdictional determination. Here there is a long history that demonstrates the court has not treated the Salmon Trout River as navigable under its Section 10 jurisdiction, but it hasn't made a formal and final jurisdictional determination as to that. Let's assume there's something. If this 2005 decision were a final agency action, what would be the normal limitations period? There's a six-year statute of limitations under the Administrative Procedure Act, and that would be something that we would have to look at as to whether or not there was some reason to stay the statute of limitations or not. But addressing that 2005 phone call, in no way could that be characterized as a final agency action. I understand you're not accepting my assumption. I just want to be very clear on that subject. In general, final agency actions aren't secret or non-public. They are the final word from the agency on whatever action it's going to take. I think the facts of this case demonstrate really why there is no final agency action and why one shouldn't be found. The only notice that the court had regarding this project was that 2005 phone call with other federal agencies in which the regulatory staff simply gave an opinion to the other federal agencies. The Huron Mountain Club has never gone to the court, asked them to do a jurisdictional determination. Kennecott has never come to the court and asked whether or not they needed a permit. I think that's something that's really critical that I'd like to correct from the appellant's argument. There's no statement from the court to Kennecott saying that no permit is required because Kennecott's never asked that question. All that's happened is the 2005 phone call and then this lawsuit. There really hasn't been an opportunity for the court to express its final opinions on the activities at issue here. In addition, I'd just like to point out that the remedy that the appellants are seeking here, which is an order from the court that would require the court to go to Kennecott and demand a permit. First of all, there's no provision for that action in the law or the regulations. Second of all, it wouldn't redress their claims because there would be no obligation for Kennecott to comply with such a request. They're not required to submit a permit application. Any party that wishes to risk it can go ahead and in the end they may be subject to an enforcement proceeding. Those penalties are severe and particularly under the Clean Water Act can result in criminal penalties in addition to significant monetary penalties. If a private party wishes to go that route and take that chance, that is within what is contemplated by the statute. Let's say the court is not enforcing the statute. What is the remedy? Which statute, Your Honor? The Rivers and Harbors? Under the Clean Water Act, a plaintiff has the right to bring a citizen suit. Under the Rivers and Harbors Act, perhaps if there's a jurisdictional determination, which is a final agency action, I suppose there's a possibility that that could be reviewable. That's not the case that we have here and I hesitate to speculate too much on that, but that's a possibility. What if the court just stops enforcing the act? How does somebody compel the enforcement? If the court had a wholesale abdication of its responsibilities under the act, I think that that might possibly give rise to reviewability by a federal court. Bearing in mind that this is the federal protection of the federal interest in navigation on waters of the United States. The Rivers and Harbors Act protects a federal interest in ensuring commerce among the several states. It is a uniquely federal interest. As a result, Congress chose not to provide a mechanism for citizen enforcement suits. Whether or not a remedy under the APA might exist for wholesale abdication of enforcement under the Rivers and Harbors Act, I think isn't entirely clear. But for these types of individual and small potential infractions, it's quite clear that Congress did not intend for private parties to be able to bring these types of claims. Under Heckler v. Cheney, the Supreme Court has made clear that every technical violation of a statute absent clear and unambiguous evidence that that is what Congress intended. Do you admit that there's evidence that there was logging? The court has not evaluated that evidence. And if it were to do a jurisdictional determination, I imagine that that would be the kind of thing that it would look into. Why didn't you do a jurisdictional? Because nobody ever asked for one. And just out of curiosity, is that the practice, that you just sit around and you could see something going on outside the window, but if nobody asks for something, you just forget it? The court can certainly take action on its own if it perceives that there's a violation and it wishes to bring an enforcement action. It certainly can and does take action. However, in these types of situations where it's not clear that there is a violation, it's often brought, in practice, what often happens is that the affected parties will bring a purported violation to the attention of the court. And nobody did that. Will do what? Will bring a purported violation of statute to the court and ask the court to look into it. Is that what happened? If the Puron Mountain Club had gone to the Corps now or many years ago, the Corps would have investigated and decided whether to require Kennecott to go through the process? Right. The Corps has guidance that says that when an affected party, which is a landowner on the water body, requests a jurisdictional determination, that the Corps should conduct such a jurisdictional determination. Now I'm really confused. So there is a provision that says that? There's regulatory guidance, not regulations, but a guidance. Okay. So there's guidance that if an affected party complains, you should do a jurisdictional assessment? If an affected party requests a jurisdictional determination, that the Corps should do so. And was there such a request? No. There wasn't. And is there a mechanism for that? Yes, there is. There is. Just finding the citation. Regulatory guidance letter number 08-02. You know, again, these are not regulations. It's a guidance document. But it's a public document. It's a public document. Publicly available? Yes. Okay. So if they had done that and you had said no jurisdiction, could they then proceed under the APA? I don't believe that any court has ever addressed the question of whether negative jurisdictional determinations are reviewable under the APA. But, you know, certainly the cases cited here show many instances in which courts have reviewed negative jurisdictional determinations. So it's certainly a possibility. All right. Mr. Ettinger. May it please the Court. Dan Ettinger, appearing on behalf of Kennecott Eagle Minerals Company. I would like to stress up front that this is an appeal of a denial of a preliminary injunction motion. And, therefore, the standard that we're dealing with here is highly deferential. So for findings of fact clearly erroneous for the denial abuse of discretion. And because I'm not going to have time, obviously, to go through all of it, I do want to stress that we don't believe that Huron Mountain Club can succeed under any of the factors for the reasons discussed by the district court. And that beyond the core APA issue that we've been discussing that I'll discuss a little bit more, there are a myriad of other reasons on the merits that their claims can't succeed. Before I forget, I want to ask a question that was asked by Judge Gibbons and Judge White about logging. And I do want to make clear, since I am pretty familiar with this underlying record that we've been dealing with in litigation for the past seven years in state court, that there is no evidence in this record or anywhere else in the historical record of floating logs for commercial purposes on the headwaters of the Salmon Trout River. And having worked with historians on this, there are absolutely reasons that you may not just, even if you're logging in that area, and there is absolutely evidence of logging activity on the land in that area over the past 120 years or so. But there are many reasons that you might transport it downstream, especially if the waters are better, by horse and carriage at one point, by rail, depending on what time you're talking about. There are plenty of reasons to do that. So you cannot just be inferred. So the history, I don't want to get down in the weeds too deep, but I appeared to be getting down in the weeds yesterday. So the chart I looked at in that historical document that says basically they were logging on the Salmon Trout River can't be taken as an inference. And there's also in that document a reference to the fact that logs were transported by river at times. But that can't be the fact that the chart that shows logging on the Salmon Trout River should not be read to infer that those logs went down that same river. It's logging along the river on the land. It doesn't mean that they were floated down the river. There's just no evidence in the record of that. Probably nobody knows, since we're talking about activity that apparently ceased around 1900. A lot of people have studied this area, both from my client as well as Mr. Addison's client. I suspect that if the evidence was out there, it would have been presented. I would like to go back to the issue that you were addressing with Ms. Smith. And I think Mr. Addison has come far afield from where he started when he filed this case and when he was dealing with it in the district court. He is, and I will refer to the alleged belief that he seeks under count one and count two, as well as paragraph 40 of his complaint, where he clearly is not talking about a failure to assert jurisdiction. He is talking about a failure of the Army Corps of Engineers under RHA and CWA to require Kennecott to submit to permitting procedures and requirements that he says are mandated by the RHA and CWA. That's right out of paragraph 40 of his complaint, and it is right out of count one and count two in terms of the belief that the club is seeking. And the reason that they're alleging specifically about permits is because Huron Mountain Club ran in, we would say at the 12th hour, not the 11th hour, after years and years of litigation in state courts, and all of a sudden said this underground mining activity, which by the way has been going on for the last eight months as of May 2012 when they filed their complaint, we need to stop this so you can get these permits. The Corps needs to force you, Kennecott, to do that. And then you need to engage in NEPA review, NHPA review, ESA review, these more procedural reviews before you can go forward with your underground activity. So the primary reason, as I understand it, that the club has used this rather awkward vehicle is because they want NEPA review, they want pre-activity review so they can enjoin the project. They want to stop the project. And so I think Ms. Smith is correct, absolutely correct, that there is no mandatory duty to require somebody to get a permit. Kennecott has no duty as a prospective project proponent to submit an application. If we don't do so, we do that at our own risk. And the Corps can enforce against us, or it can choose not to, and if they don't, the club can bring a citizen suit under the Clean Water Act. And they would have to give notice, and the importance of that notice is evident here because the Corps had no idea before this lawsuit was filed that the club apparently had a problem with the behavior. I see my time is up, so unless the Court has any questions. Mr. Addison. Thank you, Your Honor. Briefly, just on several points the Court has raised, the issue of latches has been taken up numerous times by this Court. We refer it to the Elvis Presley Enterprises case, 936 Federal 2nd at 894, as well as other citations. In that case, it simply says we have no duty. We have no duty. They have a duty to get a permit before they construct under a river or before they destroy wetlands that are waters of the United States under the Clean Water Act. We don't know anything about the time they met or the jurisdictional determination that was made by Mr. Connick until we get the affidavit in this case. Now, the Court asked about this enforcement issue. Everyone talks about Heckler. We would refer the Court respectfully to 470 U.S. at 833 Note 4. There, it's taken up, and the Heckler Court says we do not have, and they're talking about enforcement in Heckler, we do not have in this case a position by the agency to institute proceedings, or I'm sorry, on a refusal by the agency to institute proceedings based solely on belief that it lacks jurisdiction. That is exactly what Mr. Connick says in paragraph 16. Because of their analysis, it does not fall within the core Section 10 jurisdiction. Okay, well, what about this procedure to ask them to evaluate their jurisdiction? We have no duty to do that, and that's a guidance document that is, quite frankly, I do this everywhere and I've never heard of that document, but we have no duty to go to the Corps. The Corps has the duty, and I might refer the Court to a couple of other cases. But why wouldn't you want to? Well, we were too late. He mentioned eight months. If it's not too late today, why would it have been too late at some much earlier point? I mean, you could have done that simultaneously with your state court litigation. But respectfully, Your Honor, that isn't our duty. We have the right facility. I'm really not asking you whether it's your duty to utilize it. I'm just saying as a practical matter, why wouldn't the Huron Mountain Club have chosen to aggressively pursue any avenues available? I mean, you're now in this, you know, few years after the state court proceedings were concluded. You're, you know, the work is in progress. You've got factors that are, you know, when you start balancing the harms, you're in a far worse position than you would have been before they spent money and hired people. You know, it just kind of, why wouldn't you want to? Well, I guess I will just say it was the club's election to pursue litigation rather than to do that. And that happens. You can come to help yourself. Why did I do that rather than take the awkward position of trying to force the court on its own to do something that's not clearly its responsibility from the statute? Yeah, well, Your Honor, it might have been better, I will acknowledge, to have done many of these things at once, but we did this one. Well, that was kind of a rhetorical question that went to the practicalities rather than the resolution of the case. And then last, just a couple of other points on the Corps. Under the Clean Water Act, they have a mandatory duty established by the Hansen case in the Fourth Circuit, 859 Federal 2nd 313-316, which says the Corps has a nondiscretionary duty to regulate, dredge, or fill material. And to fulfill that duty, it must make reasoned wetlands determinations. The Corps has a mandatory duty to assess the relevant facts, construe the applicable statutes and regulations, and properly apply the law to those facts. That's the duty under the Clean Water Act. Turning to it briefly with a minute to go, the Clean Water Act prevents excavation under a wetland that destroys it. A wetland is the water of the United States. The judge got into the issue of whether there was a connection with the groundwater. All of the evidence in the case shows there's a connection with the groundwater, but there doesn't even have to be, because by excavating under the water, it's regulated. By harming the wetland, changing the river's capacity, it's also affected. Those are actionable under the Clean Water Act. But the judge made findings that it didn't do that. Pardon me? Didn't the judge make findings that it did not do that? He made a finding that there was no connection between the groundwater and the surface water, and that's unsupported by any evidence. All the evidence shows this river is groundwater-fed. It's impossible to draw from the river to the mine through the groundwater. The fact that you have water coming into the mine demonstrates it's in communication. Two other points, and I'll stop. You mentioned the remedy against Rio Tinto. The remedy falls under the All Writs Act. The court has the power to enjoin them, and that's commonly used in this instance. And then lastly, the court's decision, once again, that he concluded that by using water from the temporary infiltration system and dumping that in somehow balances this out is an erroneous finding that's not supported by the evidence, and it's not supported by science. When you dump in the additional water, you change the capacity of the river again. That violates Section 10, just as when you drew down the water, it affects it. Since there was recreational activity one mile from the river, and several experts, including their own, said this water will make it all the way to Lake Superior, it affected the navigable portion. Thank you, Your Honor. We appreciate the argument both of you have given, all of you have given, and we will consider the case carefully.